Good morning, Your Honors. Andrew Frisch from Mr. Ganella. Hold on one second. Of course. Mr. Frisch, go ahead. Thank you, Your Honor. The Supreme Court's holding in Freitag and this Court's holding in Samuels, read alone or in conjunction with each other, show why the Tenth Circuit's recent opinion in Malouf is not the law of this circuit, and should not be the law of this circuit. Samuels said unequivocally that a citizen cannot by silence be made subject to an unconstitutional structure. That's the law of this Court, and that makes sense, even under Malouf, because Malouf says that a litigant should have been aware of Freitag and the availability of this argument. But if you can make a litigant aware of Freitag or put a litigant on constructive notice, such a litigant would also be aware that the issue in Freitag, the Appointments Clause issue, was first raised in this circuit. And there's more. There's the argument about futility, the failure to argue this in the administrative proceedings. The commission in this case, in their brief at page 73, talks about literally a century, their word, of ALJs as employees generally and the, quote, long-settled and established practice of SEC ALJs, going back to, quote, their words, virtually the creation of the SEC. Even had we thought of this issue, we would have considered it a complete waste of time to raise it, because it would have been a complete waste of time to raise it. And, of course ---- Kennedy. Well, Mr. Lucia didn't fail to raise it when that proceeding was going on and because Justice Kagan tells us it was timely raised. Roberts. And kudos to that lawyer. Kennedy. Well, yes. So, I mean, prescient, huh? I wish I had thought of that. It's to that lawyer's credit. But the fact is, under Samuels and even under Freitag, it is plain error and it need not be the subject of a contemporaneous objection. The implication in Lucia is that if you don't make a timely challenge, you're not entitled to relief. Well, I think Your Honor is referring to that one line. Yeah, the one line. In the last page of Justice Kagan's opinion. And it's hard to tell whether she had all of this in mind or not. She certainly was addressing it. It's also in the statute. The bar is in the statute, too. The bar is in the statute. And nonetheless, this Court in Samuels and the Supreme Court in Freitag said a litigant by silence cannot consent to an unconstitutional structure. In fact, if you look at the statute, the Exhaustion Statute, a fair reading of it is that it's talking about issues of fact. The sentence right after the Exhaustion sentence talks about raising issues of fact. But this isn't a question of statutory interpretation as much as its reliance on what this Court said in Samuels and what the Supreme Court said in Freitag. There were other problems with this case other than the Lucia issue. And I want to start with the penalty not even sought by the division and about which the dissenting commissioner expressed concern, because even with deference to the agency, even with the great deference we show to the agency, the fact is, and I want to talk about this for a little because it's important, there was no financial benefit to Ganella. These numbers that are in the commission's opinion, it's real money, but it's a penalty against his trading book. But isn't there a loss to Barclays? If there's a loss. They sold through Ganella these securities and then bought them back at a premium. So they were at the same risk or more risk because they're now even sort of older securities, and yet they spent money so that Ganella could do this shifting to avoid his own payments, right? I don't dispute the math in the commission's opinion. Here's what I would say. Certainly as it goes to penalty, but also as it goes to the competing inferences in this case. That amount of money is real money to most people. But in the context of Ganella's work, it wasn't. It was enough for Barclays to fire him. Exactly. It seemed that they thought it was pretty significant, and short of firing him, it certainly may have affected his bonus, right? And it relieved them of paying his compensation, certain compensation to that point. But, yes, they fired him, and on the U-5, they said, no fraud. They have every incentive to report fraud where there is fraud, and they had all of these chats and all of these records, and they said no fraud. He violated an age. The commission on their finding of a fraud. I'm not asking the commission to be bound by it. My point is that in considering the penalty, which the commission went out and imposed, notwithstanding the division didn't seek it, and the concern of the commissioner, it is relevant to consider that the purported victim, which has every incentive to report fraud when it's defrauded, it's Barclays, after all, said, this is a violation of the aged inventory policy, and it's not irrelevant that when Ganella started offering these bonds to counterparties, he said on tapes, rather on recordings he knew were monitored, I have an old, a month-end aged problem. That's what he said. And even Ganella, or rather King, before he got his cooperation agreement, testified under oath that that's what he thought this was. He testified to no prearrangement, no gentleman's agreement. That didn't happen until after the cooperation agreement, which I'll come back to in a second, time permitting. It's important to ‑‑ I'm not suggesting, Your Honor, that there's no evidence of deceit on this record and no evidence of some fraud. But the evidence has to be considered in the context. And there are competing ‑‑ there are competing inferences which made it even more important that the ALJ be impartial and that he not assume the role of a prosecutor and after the close of evidence go out and try and fill in the factual gaps in the division's presentation. They disavowed those additional ‑‑ But it's more than that. Well, now, wait a second. I mean, the SEC is ‑‑ there's a separate finding by the SEC here. So you can say whatever you want to about the ALJ, but this is an SEC decision. So we're not reviewing the ALJ's decision. We're reviewing the SEC's decision, aren't we? You certainly are. And I think ‑‑ Okay. So why do you introduce something that's irrelevant? The SEC did not endorse the additional evidence that the ALJ interjected into the decision. Is it because you want to embellish it and somehow you think that we'll be convinced that even though we can't consider that as a matter of law, we're going to think about it anyhow? I take it ‑‑ I promise you we won't. I understand your ‑‑ You wasted your time. Go ahead. I understand the point you're making, so I'm not going to spend time on that argument, but I do want to close the loop and say this. This isn't a question of the fact that he found a couple of law review articles in an SEC order from which he cited. This is an unconstitutional officer who is showing his partiality by doing it. Our view is that it infects the entire proceeding. You're free to reject that argument, but this is more than somebody finding a couple of law review articles. It goes to the whole thing, especially when he's ‑‑ Is that it? I'm sorry, I didn't understand. His influence being a rookie. This was his first voyage, wasn't it? It was his first voyage, yes. His influence extended deep into the SEC and he affected the SEC's judgment. Is that it? Well, I wouldn't put it that way, but I do think ‑‑ Well, you're implying it. I would put it the way that I would ‑‑ You said it infected the entire proceeding. That I agree with. All right. I agree with ‑‑ I think the commission should have recognized that he was not an impartial jurist, especially given all the competing inferences that are on the record of this case, which include Ganella when he started out, reaching out to other counterparties, making clear that his purpose was to comply with the aged inventory policy. Thank you. You have some time for rebuttal. We'll hear from the other side. May it please the Court, Joshua Salzman from the Department of Justice. I'm here to address the Lucia issue on behalf of the commission. Mr. Alvarez will address the other issues in the case. When Mr. Ganella failed to raise an Appointments Clause challenge at any time before the commission, he forfeited that challenge. That's what the Tenth Circuit properly recognized in Maloof, the Ninth Circuit properly recognized in Cabani. It's consistent with Lucia's emphasis on the fact that Mr. Lucia had raised a timely challenge, and it's consistent with longstanding principles of administrative law that long predate Lucia. Going back to the L.A. Tucker case from the Supreme Court, this Court's decision in the NLRB v. Newton New Haven case and also in the Supreme Court's 1995 decision in Rider, where similarly a litigant was able to get relief because they raised a timely objection in the Supreme Court. So in a criminal case, if a magistrate judge tried the case without the consent of the defendant, but the defendant didn't raise an objection until on appeal, that would be waived in your view? Not necessarily. I think we're dealing with a different circumstance here. First, because we have a statute that specifies the scope of this Court's review. There's a statute that specifies the scope of a magistrate judge's powers, too. No, but not the scope of appellate review on that circumstance. There's no statute that I'm aware of that says a court of appeals only reviews issues raised below. Here the statute says this Court's review is limited to issues urged before the commission absent reasonable grounds. And we can talk about the reason that there are no reasonable grounds here, but this Court's is in a different place. There's also, as I said, a large body of case law specifically addressing the administrative agency context, including that L.A. Tucker decision. Well, I wouldn't mind you getting to the reasonable grounds then. Certainly. You just mentioned that he wouldn't have thought to do this because, going back to the 30s, this is how it's been done. Well, it's funny, but he litigated this claim on exactly the same timetable as Mr. Lucia, who raised the issue in June or June or July of 2015. Mr. Ginella didn't get a commission decision until August of 2016, so more than a year later. And though he submitted his final brief to the commission in March of 2015, he could have at any point between March of 2015 and August of 2016 put in a supplemental brief to the commission raising this issue. And certainly the issue was very much in the air during 2015 and 2016. It wasn't just Mr. Lucia. This wasn't one person who figured this out. Mr. Bandemir, who got relief from the Tenth Circuit, raised the issue at exactly the same time. Ms. Tilton didn't raise it before the agency at first. She, in a high-profile case, went to district court, and that case ultimately went up to here. By the summer of 2015, it was widely known that this was an issue that was percolating. And yet, Mr. Ginella did nothing. As to the futility point, I think Mr. Lucia's success by itself is as sharp a rebuke of that position or refutation of that position as you can see. Somebody did exactly what Mr. Ginella failed to do, and they got relief. Unless there are any other questions, I'd like to cede the balance of my time to Mr. Alvarez. All right. Thank you. We'll hear from Mr. Alvarez. Good morning, Your Honors. May it please the Court, my name is Paul Alvarez. I represent the Securities and Exchange Commission. As my colleague, Mr. Saltzman, explained, I will be addressing issues related solely to the merits of the Commission's decision here in the administrative proceeding against Mr. Ginella. Your Honor, substantial evidence supports the Commission's determination that Thomas Ginella violated anti-fraud provisions of the federal securities laws. He was a proprietary trader at Barclays, and in that capacity, he orchestrated a series of 12 sham transactions for his own personal benefit and to the detriment of his employer and effective client, Barclays. As you mentioned, Your Honor, he called – If he'd been a lawyer, he might have been suspended for a few years, but he'd get to practice again. I hate to say this, but the former chief judge of the New York Court of Appeals went to federal prison and now practices law again. This guy's lost his ability to trade for the rest of his life. Doesn't that seem extreme to you? Well, no, I don't think that's a completely fair characterization of the bar. The bar is a permanent bar with a right to reapply after five years. How is this more of a responsibility than a trader? No, I think – A lawyer's conversations with his or her client are protected by law. They chart the course of an individual's life with regard to the loss of their liberty, the change of their status. A lawyer's responsibilities are far, far greater than a trader, aren't they? Perhaps in some contexts. This guy lost his license for the rest of his life. He was a young man. He made a mistake. Wasn't there a dissenter with regard to the sanction? I'd like to talk about that dissent, yes. Commissioner Pevovar did dissent specifically as to the addition of one particular aspect of the bar. I agree that it's – perhaps if you look at the dissent, it might be worded a little bit confusingly, but he took issue specifically with the fact that the commission on its own initiative added a bar under Section 9B of the Investment Company Act, which additionally barred Mr. Ganella from affiliating with an investment company with a right to reapply after five years. A couple things. One, a majority of the commissioners found that that was appropriate, and to the extent that there is a due process concern, the ALJ – and this put Mr. Ganella on notice because it specifically invoked Section 9B, so he was aware of it at the time that he was charged. The ALJ, in issuing the initial suspension, referenced Section 9B again. And, indeed, the commission, the Division of Enforcement, sorry, when it cross-petitioned for a commission review below, sought additional bars of additional extended length of time. So there can't be a question that Mr. Ganella knew that this was possible. So from a due process or sort of a notice – The concern isn't a process one. It's more that it seems like a harsh sanction for the circumstances. So there's a couple things. One, the industry bar itself, he's not really taking issue – as I understand it, he's not taking issue with those particular findings on the industry bar or the penny stock bar, but rather the additional bar under Section 9B. And I think that's Commissioner Pevovar's point, that he was upset about the commission on its own initiative adding that additional bar. But the factors that you consider in imposing that additional bar, in addition to the industry and penny stock bars, are the same under Stedman. And those findings were amply supported by the record evidence below. There's a high degree of scienter that Mr. Ganella acted with. He acted repeatedly, willfully. And then when people tried to ask him about this, when they started to uncover, when his fraud started to unravel, he lied about it repeatedly to his supervisors and to the compliance officers at Barclays. And he exposed Barclays to additional risk. There's risk of holding on to securities that you don't know the value to. How do you respond to the argument that Barclays found no fraud? Excuse me. Sure. I don't necessarily agree with that characterization, that the U-5 didn't find fraud. I think as was mentioned earlier, the fact that Barclays found or didn't find fraud is irrelevant, particularly in light of the fact that there are differing interests that Barclays has in filling out the U-5 form to the government's interests in making sure that wrongdoing is rooted out and stopped. So I don't think that those two things necessarily align. But even to the extent that Barclays said what it said, those findings are consistent with what the commission found. Barclays found, in addition, that Mr. Ganella was deceptive about the reasoning for the trades. And that's consistent with the commission's finding that he lied as part of this fraud. So his scheme hurt Barclays, and he used lies to cover it up. And it was not an abuse of discretion in this situation for him to take a timeout and to have a right to reapply after five years. And, Your Honor, you had mentioned that this was a life sentence and this was far worse than an attorney. And, you know, to the extent that I would disagree with that characterization because he has the right to reapply, and if he can show good cause, then the commission has looked favorably upon applications that show good cause where there is a specified right of time after which someone can reapply for admission. So this is not an open-ended bar that he has no opportunity to gain readmittance to a particular industry. He just has to show that good cause is in existence. So this is not a death sentence, as you had referred to it. Unless the Court has any further questions. Thank you. Thank you. I ask the commission's decision be affirmed. Thank you. We'll hear the rebuttal. Your Honors, I just want to make two quick points, if you would allow me. The first of which is this, and it's relevant to the evidence at the hearing, but also to the penalty. A trillion percent he did not do this for personal benefit, and there's nothing in the record that supports that. A trillion percent. I take Judge Sullivan's ---- Correct. That's true. I mean, that would have been charged against his book. Would have been charged against his book, right? The reason he did this was to comply with the policy. Judge Sullivan, there's no evidence to the contrary other than the fact that he did this to comply. He may have ---- if you take the most nefarious view of this, you may say it's fraud and it's deceit and it's stock parking, but his reason for doing it was not to put money in his pocket. The relationship between what he gained financially from doing this and what was possible or actual is so attenuated. This is a broker who had been at Barclays for two or three years, and he was earning, before the year he was fired, making book profits of $32, $30 million. Money's money. I grant you that. But $100,000 or whatever numbers are in the commission's opinion do not personal benefit make. That's not why he was doing it. He was doing it to comply with the policy. Misguided, and maybe more, if Your Honor so find, but not to line his pockets with money. Well, it would have affected his bonus, right, if he had, presumably, if he had ---- if he was not complying with the policy and was keeping things on his books for more than seven months, it's going to be charged against his book, maybe it's a trivial amount, but it's also likely to affect his bonus, which is the vast majority of his compensation, right? There's no evidence on this record that it's likely. Well, but the company fired him for doing this, so presumably if they thought it was serious enough to fire him, it would have been serious enough to dock him some compensation on bonus, right? No. They fired him, putting aside the atmosphere in which we live and why companies fire people, they fired him because he violated the aged inventory policy and maybe take the SEC what they say because he was deceptive about it. But it's really hard to look at this record and draw the inference that he did this for his personal benefit. He was making $30, $32 million. What was the ---- I mean, what's in the record to indicate his reason for doing it, just the love of the game? There's no evidence that he was doing it for personal benefit. The evidence is ---- But what about common sense? I mean, he was doing this for his own personal benefit. I don't see it as being a breach at all. It may not have been a financial benefit, but it was so that he was in compliance with the policy and therefore would be in better standing with the company. That I agree with. All right. I meant to say personal financial benefit, but the way Your Honor has phrased it I think is fair. Okay.